[Cite as *State v. Brofford*, 2013-Ohio-3781.]

### IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### UNION COUNTY

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**                    **CASE NO.  14-12-08**

    **v.**

**SCOTT W. BROFFORD,**               **O P I N I O N**

    **DEFENDANT-APPELLANT.**

Appeal from Union County Common Pleas Court
Trial Court No. 11 CR 0032

**Judgment Affirmed**

**Date of Decision:  September 3, 2013**

**APPEARANCES:**

    *Jeffrey M. Gamso* **for Appellant**

    *David W. Phillips and Melissa A. Chase* **for Appellee**

**WILLAMOWSKI, J**.

{¶1} Defendant-Appellant, Scott W. Brofford ("Mr. Brofford"), appeals the judgment of the Union County Court of Common Pleas, after a jury found him guilty of felonious assault, assault, complicity to commit felonious assault, criminal damaging, and two counts of aggravated menacing. On appeal, Mr. Brofford contends that the trial court committed several errors: failing to give the appropriate response to a question from the jury; allowing a state's witness to give opinion testimony; excluding the testimony of a defense witness; and sentencing Mr. Brofford separately for allied offenses of similar import. He also claims that he was denied effective assistance of counsel. For the reasons set forth below, the judgment is affirmed.

{¶2} On February 28, 2011, the Union County Grand Jury issued a two-count indictment charging Mr. Brofford with felonious assault, alleging that he caused serious physical harm to Jonathan P. Kelley ("Jonathan" or "Jon"), and complicity to commit felonious assault, in violation of R.C. 2903.11.(A)(1). Both were felonies of the second degree. Four additional counts were added on August 22, 2011, by way of a Bill of Information: criminal damaging or endangering, in violation of R.C. 2909.06(A)(1), a misdemeanor of the second degree; aggravated menacing in violation of R.C. 2903.21(A), a misdemeanor of the first degree; assault, in violation of R.C. 2903.13(A); and aggravated menacing, in violation of

R.C. 2903.21(A), a misdemeanor of the first degree.[1] All counts arose out of an incident which occurred on the Broffords' property on January 23, 2011, Mr. Brofford's son, Wesley Brofford, was also indicted on that date for felonious assault arising from the same incident. Both cases were tried together in a four-day jury trial on August 23-26, 2011.

{¶3} The incident giving rise to the charges began late on the evening of January 22, 2011, when 17-year-old Jonathan was hanging out and drinking beer with two of his friends, 18-year-old Luke Parrish ("Luke"), and 20-year-old Michael Gayle ("Michael"). Also present were two girls, Ashley Winterstellar ("Ashley") and Taylor Watkins ("Taylor").

{¶4} Late that evening, Jonathan received a call from his stepbrother telling him that he had recently had an altercation with Nick Sparks ("Nick") and some of Nick's friend. Nick and these friends were also friends of Jonathan, and Jonathan was upset about what had occurred. Jonathan called Nick, who was at the Broffords' house. Nick and several of his friends had also been hanging out together and drinking beer and playing beer pong at the Broffords' house, even though they were also underage. The conversation did not go well and apparently Nick told Jonathan to come out to the Broffords' so they could "settle" things, or

---

[1] A waiver of indictment was filed pertaining to the additional counts in the bill of information. Count 3 alleged he caused harm to Jonathan's mother's 1999 Honda Civic; Count 4 alleged he knowingly caused Michael Gayle to believe that he would cause serious physical harm to Michael Gayle's person or property; Count 5 alleged he caused or attempted to cause physical harm to Luke Parrish; and Count 6 alleged he caused Luke Parrish to believe that he would cause serious physical harm to the person or property of Luke Parrish.

perhaps so that Nick could beat him up. (Tr. 8/23, pp. 36, 202) Jonathan was "pretty fired up" after the conversation, and wanted to go out to the Brofford house to either "confront" Nick, or "to fight" with him, according to the testimony of the different witnesses. (Tr. 8/23, p. 40; Tr. 8/24, pp. 35, 175).

{¶5} Jonathan, Luke and Michael drove to the Broffords' place in Jonathan's Honda Civic (owned by Jonathan's mother). While they were driving, Jonathan made several more calls to Nick to let him know they were coming. (Tr. 8/23, pp. 37, 39) Ashley and Taylor also drove to the Broffords' in Ashley's vehicle and parked near the Honda.

{¶6} As soon as they arrived at the Brofford place, Jonathan got out of his car, and Nick came out of the house, followed by a number of the other young men and women who were at the Brofford house, including Tory Stover ("Tory"), Devon Kiss ("Devon"), William Converse ("Billy"), and 18-year-old Wesley Brofford.

{¶7} Jonathan and Nick yelled at each other and exchanged words at first. Then Jonathan pushed Nick, who then punched Jonathan. They traded punches for a while until Nick tackled Jonathan to the ground. (Tr. 8/23, pp. 45-46)

{¶8} While Jonathan was on the ground with Nick on top of him, Nick kept pummeling Jonathan, and one or more of the others battered and kicked Jonathan numerous times around his head and face. The witnesses who testified sometimes

presented varying details about the fight and about whom they actually saw kicking Jonathan.[2]  Often the discrepancies were due to their location and what they could see, the fact that there was a lot of commotion and activity going on in multiple locations over a fairly short period of time (5-10 minutes), and because they were also preoccupied with their own situation.

{¶9} Jonathan, for instance, testified that he didn't see everyone who kicked him because he was otherwise trying to cover his face to protect himself, and he was reeling from the effects of the hard blows.  (Tr. 8/23, pp. 47-48)   He did see Tory kick him.  He knew he was surrounded by Wesley, Mr. Brofford, and others, and felt himself getting kicked multiple times.  (*Id.* at 50)  He remembers Tory kicking him and saying "this is what you get for coming out here sticking up for your brother."  (*Id.* at 49)  He also testified that Mr. Brofford "was up in my face saying 'this is what you get.'"  (*Id.*)  He said that Mr. Brofford was the last person to kick him "right before I got up is when – is when I got kicked the hardest."  (*Id.* at 111)   When Jonathan got up, he remembers seeing Wesley Brofford and Mr. Brofford there.  (*Id.* at 50)

{¶10} Luke testified that he was trying to tell Billy and Tory and some of the others to stay out of the fight and let it be a "one-on-one." (Tr. 8/23, p. 148)

---

[2] In fact, several of the witnesses gave statements to the police that evening, or shortly thereafter, identifying Aaron Brofford, Mr. Brofford's younger son, as one of the people kicking Jonathan.  Aaron was also charged, as a juvenile.  Later, it was learned that the witnesses were mistaken and that Aaron was upstairs in his room the entire time.  The charges against Aaron were dismissed.

However, Mr. Brofford then came up and hit Luke in the head, and was chasing him around the car, trying to get to him, while yelling and threatening him. (*Id.* at 148-150.) Luke also testified that he saw a group standing around Jonathan and kicking him. He didn't see some of the bystanders kicking Jonathan, but he testified that he was "100 percent sure that [Mr. Brofford], Wes Brofford, and Tory Stover were." (*Id.* at 154) He saw more people there, but didn't see if they were actually kicking him. (*Id.* at 169)

{¶11} Michael testified that he saw Tory kick Jonathan first, but then he also saw Nick, Mr. Brofford, and Wesley Brofford kick him too. (*Id.* at 207) He also heard Mr. Brofford yell "get him" and "beat his ass and make sure they never come out here again." (*Id.* at 206) Michael testified that he believed Mr. Brofford kicked Jonathan more than once, but he only actually saw him kick him one time. "I witnessed [Jonathan] laying on his face with his face turned towards Mr. Brofford. And Mr. Brofford kind of like speed walking up to him and kicked him in his face. Flat out in front in his face, not the side of his head, not in the back of his head. He kicked him in his face. * * *" (*Id.* at 210) Michael testified that he was not involved in the fight, other than to try to break it off when he pulled Nick off Jonathan. (*Id.* at 209; Tr. 8/24, p. 19)

{¶12} Ashley testified that she saw Mr. Brofford hit Luke and chase him around the car, and that Mr. Brofford was also standing by Jonathan and yelling

and encouraging them to "beat his ass." (Tr. 8/24, pp. 168-169) She testified that she saw Billy, Mr. Brofford and Wesley kicking Jonathan. (*Id.* at 170)

{¶13} Devon testified that he had seen Tory, Billy, and Wesley Brofford cheering Nick on to win, and that he had seen Mr. Brofford go up to Luke and hit him on the head when Luke tried to get the others to let it be a "one-on-one" fight. (Tr. 8/24, pp. 213-214) Devon testified that he heard Mr. Brofford telling everyone to get off his property and telling Nick to "whop his ass." (*Id.* at 215)

{¶14} Devon then went back inside, thinking the fight was over after Nick was pulled off Jonathan, but when he turned and stepped onto the porch to go back outside, he said that he saw "they were all in a group, and their legs were coming back and I heard a horrible sound and they were all kicking him." (*Id.* at 217)

Q. Who is "they," Devon?

A. Wes Brofford, Tory Stover, Billy Converse, [and] [Mr. Brofford] made his way over to the pile at this time. And I seen all them kicking him.

* * *

Q. And you were able to hear – and what did the sound sound like?

A. It was the worst sound of my life. It was a thud and over and over and I could hear it. Once I stepped back inside, I could still hear that sound. * * *

(*Id.* at 217-218)

{¶15} When the fighting stopped, Jonathan's friends were very concerned about his condition and they carried him to his car in order to take him to the hospital. They were delayed in leaving because the keys had been lost in the melee. While they were attempting to leave, Mr. Brofford was yelling at them to get off his property. Several testified that Mr. Brofford threatened to get his gun. Also, while they were trying to leave, Mr. Brofford hit the Honda's spoiler and broke it, while others were kicking at the car. Someone broke off the side-view mirror.

{¶16} They were unable to locate Jonathan's keys, so Luke, Michael, Ashley and Taylor then helped get Jonathan into Ashley's car and they drove away. Luke called his father on the way and arrangements were made to meet an EMT ambulance at a nearby parking lot. They met with the paramedics and Jonathan was transported to the emergency room.

{¶17} Dr. Matthew Sanders, the emergency room physician who treated Jonathan, testified that Jonathan had abrasions, lacerations and contusions and bruising, with swelling and with dried blood about the face. (Tr. 8/24, p. 74; Ex. 43) Fortunately, there was no loss of consciousness and there were no fractures. (Tr. 8/24, pp. 82-83) The CT scan did not show any intracranial hemorrhage or edema. (Ex. 43) Jonathan was treated and given pain medications in the hospital

and told to continue to take them to combat the pain. He was then released and instructed to follow-up with his own physician.

{¶18} There was also testimony from two other physicians who treated Jonathan after the initial ER visit. Dr. Jennifer Morrison, an ophthalmologist, testified about his appearance and the condition of his eyes, and the fact that this trauma to his eyes puts him at a slightly greater risk for complications as he grows older. (Ex. 45) Dr. Justin Krueger was a specialist in pediatrics and internal medicine who also treated Jonathan and testified at the trial as to in the injuries that he observed. (Tr. 8/25, pp. 5-126; Ex. 44)

{¶19} Dr. Timothy Treece, a plastic surgeon with considerable experience in facial and head injuries, testified as an expert witness on behalf of the defense. (Tr. 8/25, 142-179; Defendants' Ex. 8) Dr. Treece testified that, although Jonathan's injuries may have been traumatic to look at, they were not major life-threatening injuries. (Tr. 8/25, p. 150) He testified that he believed the injuries were more consistent with punching, rather than kicking, but acknowledged he couldn't say for certain if an injury came from a punch or a kick. (*Id.*, pp. 157; 171)

{¶20} In addition to the above witnesses, the jury heard testimony from Luke's father, Jonathan's mother, a BCI witness (some blood that was retrieved from Wesley Brofford's shirt contained DNA consistent with Jonathan's DNA),

and Deputy Matthew Henry, from the Union County Sherriff's Department, who investigated the matter. A tape was also played for the jury of Deputy Henry's initial interview with Mr. Brofford and Wesley, wherein they both denied any involvement in the incident, and claimed that they had not even been outside. (Ex. 47) Mr. Brofford had also told the deputy that Nick and several of the others had left much earlier in the evening, and he denied knowledge of any physical fight. (*Id.*)

{¶21} After hearing all of the evidence, the jury returned guilty verdicts for both Mr. Brofford and Wesley.[3] The jury found Mr. Brofford guilty of five of the six counts – all except for misdemeanor count of aggravated menacing pertaining to Michael. The trial court sentenced Mr. Brofford to four years in prison on the felonious assault charge, four years on the complicity charge, and six months on each of the remaining three misdemeanor charges. All sentences were ordered to be served concurrently, for a total of four years in prison. He was also fined $5,000 and ordered to pay restitution. The trial court granted the Appellants' motion to stay the sentences and to release Wesley Brofford and Mr. Brofford on bond, pending the outcome of their appeals.

---

[3] Wesley Brofford was sentenced to three years in prison and is also appealing this decision in 3d Dist. App. No. 14-12-07.

{¶22} It is from this judgment that Mr. Brofford now appeals,[4] raising the following five assignments of error for our review.

### First Assignment of Error

**The trial court abused its discretion when in response to a question from the jury during deliberations regarding whether they had to find the defendant guilty, it refused a defense request simply to say "no."**

### Second Assignment of Error

**The trial court abused its discretion when it ruled that a state's witness would be allowed to give opinion testimony as an expert although the State did not provide a report as required by Crim.R. 16(K)**

### Third Assignment of Error

**Insofar as counsel's failure to renew his objection to opinion testimony from Dr. Sanders at the time the testimony was given may be deemed to have waived the error absent plain error, counsel's representation was constitutionally ineffective and deprived Mr. Brofford of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

### Fourth Assignment of Error

**The trial court committed error when it excluded testimony of Jennifer Ruffing regarding a prior inconsistent statement by State's witness Devon Kiss.**

---

[4] The Broffords appealed from the trial court's first J.E. of Sentencing, filed October 4, 2011, but this court remanded the matter because the order did not specify the amount of restitution to be paid and was, therefore, not a final appealable order. The Broffords then appealed from the trial court's second J.E. of Sentencing, filed on February 9, 2012. However, this appeal was stayed while the matter was remanded to the trial court to correct the sentencing order to include conditions of post-release control. The appeal was reinstated after the third J.E. of sentencing was filed on May 29, 2012.

**Fifth Assignment of Error**

**The trial court committed error when it sentenced Mr. Brofford for both felonious assault and complicity to felonious assault as they are allied offenses of similar import.**

*First Assignment of Error – Response to Jurors' Inquiry*

{¶23} Mr. Brofford claims that the trial court erred in the manner in which it responded to questions from the jury. He maintains that the trial court should have answered the first question with a simple "no," and that the trial court's answer did nothing to assist a jury that did not understand the jury instructions.

{¶24} After deliberating for a while, the jury submitted the following questions to the trial court:

> If we agree that it is serious physical harm and we do agree that Mr. Brofford did kick [Jonathan Kelly], does that make him guilty of felonious assault?

And, related to the first question: "Need clarity on Page 4, ¶ 1 & 2." This communication was accompanied by a copy of the jury instructions with some "stars" marked on page 4 with the section dealing with the issue of causes.[5]

{¶25} The trial court conferred with counsel in chambers, "informally" about how to respond to the jury, but that discussion and the arguments that were

---

[5] The relevant passage from the jury charge was also set forth in the transcript: "There may be one or more causes of an event. If the defendant's act was one cause then the existence of other causes is not a defense. The defendant is responsible for the natural consequences of his own unlawful act even though the serious physical harm may also have been caused by the act of another person or persons. When a person acting individually or in concert with another sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, approximate, and reasonably [foreseeable consequences] resulting from his original criminal act." (Tr. 8/26, p. 102)

-12-

made were not recorded. When they resumed the discussion on the record, Mr. Brofford's attorney stated that he believed the question should be answered "no." (Tr. 8/26, p. 116) The trial court responded that, while it didn't disagree that it could be answered "no," it believed that such an answer would be incomplete and misleading and that more amplification was necessary. (*Id.* at 116-117)

{¶26} Therefore, the trial court returned the note to the jury with the following answer:

> The Court cannot determine for you the guilt or innocence of a defendant. Please review the facts in light of the elements of the offense with which you are concerned and be guided by the instructions concerning those elements. Judge Faulkner

{¶27} Mr. Brofford submits that the trial court erred when it told the jury to rely on its understanding of what it had already demonstrated it misunderstood. Mr. Brofford believes the trial court's refusal to give an answer that "it agreed was correct," constituted an abuse of discretion.

{¶28} In *State v. Carter*, 72 Ohio St.3d 545, 1995-Ohio-104, paragraph one of the syllabus, the Supreme Court of Ohio held that, "[w]here, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request." In *Carter*, as in this case, the jury had asked a question requesting further explanation and clarification of the jury instructions. The judge had responded by refusing to instruct further and by telling the jury that it had all the

instructions it needed. *Id.* at 553. The Ohio Supreme Court concluded that the trial court had acted within the scope of its discretion when it referred the jury to a written copy of the instructions rather than giving further, additional instructions. *Id.*

{¶29} The situation in *Carter* is very similar to this case. Mr. Brofford's representation that the trial court refused to give an answer it "acknowledged was correct" omits the fact that the trial court also stated that such an answer was also "incomplete and misleading." (Tr. 8/26, p. 117) Answering "no" to the question in response to the jury's question would have improperly put the judge into a decision-making role. The trial court recognized that it could not determine guilt or innocence for the jury, and instructed them as such. If the trial court would have answered "no," it would have had to expand on its answer and explain, "no, depending upon . . . ." or "no, but only if . . . ." As the trial court explained, "no" by itself was "incomplete and misleading." The complete and correct answer as to what the jury needed to consider was contained within the jury instructions.

{¶30} The trial court gave the jury a correct answer when it instructed the jury to carefully review the jury instructions and consider them in the context of the elements of the offense. *See Carter*, *supra*. As such, we cannot say that the trial court's decision was unreasonable, arbitrary or unconscionable. The first assignment of error is overruled.

*Second Assignment of Error –*
*Treating Physician's Opinion Testimony*

{¶31} Mr. Brofford complains that the emergency room physician who treated Jonathan should not have been allowed to give "opinion testimony" as an "expert witness" because the State did not provide a report as required by Crim.R. 16(K). Mr. Brofford asserts that the trial court abused its discretion when it failed to sustain defense counsel's objection to this testimony.

{¶32} The State asserts that (1) defense counsel did not preserve the error because the objection was made prior to his testimony, akin to a motion in limine, and that counsel failed to renew the objection when the physician was asked whether the history was consistent with the injuries he observed and treated; and (2) that Crim.R. 16(K) is not applicable here because Dr. Sanders was testifying as a fact witness as the treating physician.

{¶33} Questions regarding the admission or exclusion of evidence are within the trial court's discretion. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). It involves views or actions "that no conscientious judge, acting intelligently, could honestly have taken." (Internal citations omitted.) *State v. Hancock*, 108 Ohio St.3d 57, 2006–Ohio–160, ¶ 129–130.

**{¶34}** Crim.R. 16(K) sets forth the discovery rules for expert witnesses and their reports, and states:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

Crim.R. 16(K).

**{¶35}** Contrary to Mr. Brofford's assertion, we do not find that Dr. Sanders testified as an expert witness. It is well established that treating physicians can be called at trial to testify as viewers of their patients' physical condition and not as experts retained in anticipation of litigation. *Henry v. Richardson*, 193 Ohio App.3d 375, 2011-Ohio-2098 (12th Dist.), ¶ 33; *Fischer v. Dairy Mart Convenience Stores, Inc.* (1991), 77 Ohio App.3d 543 (8th Dist.1991). Evid.R. 701[6] allows treating physicians to render opinions based upon their personal observations and perceptions. *See Williams v. Reynolds Rd. Surgical Ctr.*, 6th Dist. No. L–02–1144, 2004-Ohio-1645.

---

[6] Evid.R. 701 states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

**{¶36}** In the case at bar, Dr. Sanders testified as a fact witness, testifying about the facts that he observed while he was treating Jonathan, and about the notes that were in the record obtained as part of the patient history upon admission.

> The patient reported that he was seventeen years old. We were told that he was assaulted, he told me by four other people at the time. And that he had been kicked. That apparently he had no loss of consciousness. The nurse had noted he had vomited prior to arrival. There was no vomiting noted upon his arrival. And when we saw him, the medics had placed him on a backboard with a cervical collar in place as a precaution. And we had noted the obvious injuries and abrasions about and contusions about the face. He told me he had not gotten kicked in the abdomen or groin and denied any pain about the extremities, arms or legs.

(Tr. 8/24, p. 73-74). Dr. Sanders continued to describe the examination, tests, and treatment that was provided for Jonathan. He explained that he used a tissue glue known as Dermabond to close a one-centimeter laceration below the right-eye, which is an option that can be used rather than stitches or suture. (*Id.* at 81) Then, the State asked:

> Q.   And Doctor, if I can ask you within a reasonable degree of medical certainty whether the history reported to you was consistent with the observations that you made.
>
> A.   Yes.

(*Id.*) This concluded the State's direct examination of Dr. Sanders, and defense counsel proceeded with cross-examination.

{¶37} The doctor had been told that Jonathan had been in a fight and had gotten assaulted and kicked, and he indicated that the injuries he observed were consistent with that. The doctor confined his testimony to his observations of the physical condition of Jonathan in the course of his treatment. This opinion was rationally based on his own perceptions.

{¶38} Dr. Sander's testimony was not like the testimony of Dr. Treece, who did testify as an expert witness for the defense. Dr. Treece did not treat Jonathan but gave his expert opinion as to whether the injuries constituted serious physical harm, and as to whether the specific injuries may have been caused by a kick, what force of kick, a punch, or being "elbowed."

{¶39} The fact that Jonathan's injuries were caused by being assaulted and kicked did not appear to be a point of contention; the question before the court focused more upon *who* caused the injuries. Dr. Sander's opinion did not involve a serious issue regarding the content of the assault suffered and did not attempt to discern whether his injuries were the result of full-force kicks, or whether they were from being punched and elbowed.

{¶40} We do not find that the trial court abused its discretion in the admission of the ER treating physician's testimony. Finding that there was no error in the admission of Dr. Sander's testimony, we need not determine whether

or not defense counsel properly preserved his objection. Accordingly, the second assignment of error is overruled.

*Third Assignment of Error –*
*Ineffective Assistance of Counsel*

{¶41} Mr. Brofford contends that his attorney was ineffective and deprived him of his constitutional right to representation because of his failure to renew his objection to the opinion testimony from Dr. Sanders at the time the testimony was given. As a result, any error in admission of the testimony was waived, absent plain error. Mr. Brofford maintains that this error prejudiced his case.

{¶42} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation; and (2) prejudice—a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–688 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that strategy and tactical decisions exercised by defense counsel are well within the range of professionally reasonable judgment and need not be analyzed by a reviewing court. *State v. Robinson*, 108 Ohio App.3d 428 (3d Dist.1996).

{¶43} Based upon our disposition of the second assignment of error, this assignment of error is moot. We found that there was *no error at all* in the admission of Dr. Sander's testimony. Therefore, even if his attorney would have renewed his objection, the outcome would not have been changed. There is no evidence in the record that the actions of Mr. Brofford's attorney was deficient in any way, or that he suffered any prejudice as a result of his representation. The third assignment of error is overruled.

*Fourth Assignment of Error –*
*Exclusion of Statement by Impeachment Witness*

{¶44} In this assignment of error, Mr. Brofford complains that he was not permitted to impeach the testimony of Devon with extrinsic evidence of an inconsistent statement allegedly made by Devon to the defendants' investigator. At trial, Devon testified that he had seen Tory kick Jonathan and that he had also seen Mr. Brofford and Wesley kick Jonathan. However, Mr. Brofford claims that Devon had previously told the defense investigator, Jennifer Ruffing ("Ms. Ruffing") that "he *only* saw Tory Stover kick [Jonathan]." (Emphasis added; Appellant's Br., p. 16) On cross examination, Devon was briefly asked, "Have you previously stated that Tory Stover is the only person you saw kick him?" (Tr. 8/24, p. 241) Devon answered, "No." (*Id.*)

{¶45} Mr. Brofford claims that he wanted to impeach Devon with his prior statement to the investigator but the trial court would not permit Ms. Ruffing to

testify. He claims this was "a discovery sanction," because he had not provided the State with a copy of the witness's statement under the reciprocal discovery obligations set forth in the recently amended Crim.R. 16 (effective 7-1-10).

{¶46} Therefore, at the conclusion of the testimony on August 24th and 25th, Mr. Brofford proffered the statements of two witnesses. The record shows that from 4:35 p.m. to 4:38 p.m. on August 24th, a "proffered" cross-examination of Devon was conducted by defense counsel, out of the hearing of the jury and the judge. (Tr. 8/24, p. 266) At this time, defense counsel asked more detailed questions as to whether Devon recalled speaking to Ms. Ruffing and what he had told her.

> Q. Did you tell Miss Ruffing that right after that, that sound, that you saw Tory getting ready to kick and you heard the worst sound in your life?
>
> A. Yes.
>
> Q. You told her that?
>
> A. Yes.
>
> Q. Did you then tell her that you went inside the house right after that?
>
> A. I don't recall what I told her.
>
> Q. Did you tell her that you didn't see anyone else kick Jonathan after that?
>
> A. I don't recall telling her that.

Q. Did you dispute that you said that?

A. What do you mean?

Q. Are you saying you did not say that to her or you just don't recall?

A. I said I don't recall. I could have.

Q. You may have said that to her?

A. Yes.

(Tr. 8/24, 268-269).

**{¶47}** The following day, after the jury had exited the courtroom, the record shows that from 4:39 p.m. to 4:41 p.m., defense counsel proffered the following testimony of Ms. Ruffing.[7] (Partial Tr. of Proceedings, 8/24, pp. 3-4)

Q. You spoke to Devon Kiss at some time?

A. Correct.

Q. Do you recall the date on which you spoke with him?

A. I do not.

Q. Was it after January 23rd, 2011?

A. Yes.

---

[7] The record at the conclusion of the trial on 8/25, after indicating that the jury left the courtroom, contains the following statement: "THEREUPON, THE PROFFERED EXAMINATION OF JENNIFER RUFFING BY DEFENSE COUNSEL IS NOT AVAILABLE BY DIGITAL RECORDING. THE EQUIMENT WAS ACTIVATED FOR THE EXAMINATION, BUT DUE TO UNKNOWN REASONS, WAS NOT RECORDED." (Tr. 8/25, p. 181) Defense counsel had filed a Joint Motion for 9(E) Certification with this Court in November 2012. However, the recording was located and was transcribed in a supplemental transcript, so it was not necessary to proceed with the App.R. 9(E) motion (which had never been verified by the State or the trial court).

Q. Who, if anyone, did Devon say kicked [Jonathan]?

A. Devon Kiss told me that Tory Stover kicked [Jonathan]?

Q. Did he indicate that anyone else kicked [Jonathan]?

A. No.

(Partial Tr. of Proceedings, 8/24, p. 4) That exchange concluded the brief proffer of Ms. Ruffing's testimony.

**{¶48}** On appeal, Mr. Brofford contends that the trial court erred when it excluded the extrinsic evidence of Devon's alleged prior inconsistent statement. He claims that the trial judge had excluded the investigator's testimony "on the grounds that the [investigator's] statement had not been previously disclosed to the State in discovery," pursuant to Crim.R. 16 (Joint Motion for Stay of Execution of Sentence, p. 2) Mr. Brofford argues that the trial court's decision was in error because Crim.R. 16 does not require a defendant to turn over a statement made by the State's own witness, especially when the statement was only to be used for impeachment purposes; that Evid.R. 613 permits extrinsic evidence of a prior inconsistent statement; and, that the exclusion of Devon's testimony was not harmless error in that he claims Devon's testimony was more significant than that of the other witnesses because Devon was the only truly "neutral" witness out of the five eye-witnesses who testified. (App. Br., p. 16) Mr. Brofford alleges Devon's testimony would have more significance to the jury because he was

friends with all of those involved and he was the only witness who was present at the incident that had not come with Jonathan that evening (those other witnesses being Jonathan, Luke, Michael, and Ashley).

{¶49} The State contends that there is no error because: (1) Mr. Brofford failed to preserve this error for review; (2) a proper foundation was not laid for the admission of extrinsic statements as required by Evid.R. 613(B); (3) Mr. Brofford failed to comply with Crim.R. 16 requiring prior disclosure of Devon's statement, so exclusion was appropriate; and, (4) in any event, the exclusion of the statement was harmless error beyond a reasonable doubt. Based on the record before us, we agree with several of the State's claims.

{¶50} First, we must agree that Mr. Brofford failed to properly preserve this error for review. There is no indication in the record that suggests that Mr. Brofford ever attempted to call Ms. Ruffing to the stand in an attempt to introduce this extrinsic evidence. Similarly, there is no record where the trial court prohibited the introduction of this testimony, or, if so, the basis for such a ruling.

{¶51} It is true that counsel proffered Ms. Ruffing's limited testimony, so something must have occurred to precipitate this action. However, the reason for the proffer is not clearly stated on the record.

{¶52} The only reference in the record was to a discussion held outside of the presence of the jury, just prior to the defendants resting their cases, wherein

defense counsel referenced a prior discussion, held off the record, "relative to reconsideration of the ruling on the Rule 16 issues, particular as it relates to the testimony of Devon Kiss and the ability for us to call our investigator to testify that he had previously given a different version of events when she interviewed him." (Tr. 8/26, pp. 4-5) Defense counsel informed the trial court that it had proffered Ms. Ruffing's testimony the previous day

**{¶53}** The duty to provide a transcript for appellate review falls upon the appellant. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980). "This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record." *Id.*, *citing State v. Skaggs*, 53 Ohio St.2d 162 (1978). *See, also*, App.R. 9. "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Knapp* at 199.

**{¶54}** This Court finds the absence of a definitive record on this important issue to be troubling, especially since it is clear that *something* occurred below, given that testimony was proffered, and references were made to the issue during discussions held with the trial court prior to closing arguments and during sentencing. However, unless the record transmitted on appeal affirmatively

demonstrates error, this court must presume the trial court committed no error. *See Roberts v. Payton*, 105 Ohio App.3d 597 (11th Dist.1995).

**{¶55}** However, even if we were to presume that sufficient references were included in record to allow this Court to rule on the merits of Mr. Brofford's argument, we find we would still overrule this assignment of error. Before extrinsic evidence is admissible to impeach a witness, a party must comply with Evid.R.613(B). Evid.R. 613(B) states, in part, that extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2) The subject matter of the statement is one of the following:
>
> (a) A fact that is of consequence to the determination of the action other than the credibility of a witness
>
> (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);
>
> (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

**{¶56}** The record does not demonstrate that Mr. Brofford complied with Evid.R. 16(B)(1). During cross examination, he merely asked Devon whether or not he had ever stated that Tory Stover was the only person he saw kicking

Jonathan, to which he replied in the negative. (Tr. 8/24, p. 241) It was not until after the jury was dismissed for the day that defense counsel proffered a detailed foundation with Devon that would have been necessary before extrinsic evidence from Ms. Ruffing could have been offered for impeachment purposes. There is no indication given as to why Devon was not questioned about this matter on the record and in front of the jury while he was being cross-examined, or why this witness's testimony was proffered off the record, rather than merely having him recalled to set the necessary foundation. Devon was not given the opportunity to explain or deny the inconsistent statement on the record, and the State was not given the opportunity to interrogate him concerning the statement. Therefore, the trial court's decision to exclude the extrinsic evidence may have been based upon this issue. Although, without a record of the court's discussion and ruling, we do not know what occurred.

{¶57} Likewise, although we believe Mr. Brofford has raised some valid concerns about the application of Crim.R. 16 under these circumstances, we must decline to rule on this matter. Without a record before us that gives us more information as to exactly what the trial court's ruling was, and what it was based upon, any further review on our part would be based purely on speculation.

{¶58} However, *even if* all of the above issues had not been present, and even if we would have found that the exclusion of the extrinsic evidence was in

error, we find that it would have been harmless error. Excluding Ms. Ruffing's testimony did not violate Mr. Brofford's rights to compulsory process and to present a defense. There were *four other witnesses* who testified that they saw, or were aware of the fact, that Wesley and Mr. Brofford had participated in kicking Jonathan. Even without Devon's testimony, there was more than sufficient evidence to support Mr. Brofford's conviction.

{¶59} The record does not support Mr. Brofford's assertion that Devon's testimony was "the most devastating of the state's witnesses" because he was not affiliated with the group that came with Jonathan and, therefore, the jury would not perceived him to be biased. (*See* App. Br., p. 18) *All* of the young men and women had testified that they were friends with most of those who were present, including Jonathan being friends with Nick, Tory, Devon, and others. Devon and Taylor were boyfriend and girlfriend (Tr. 8/23, p. 119) and Jonathan was dating Devon's sister (*Id.* at 89). He was certainly not a "neutral" witness. Therefore, the record does not indicate there was any reason for the jury to believe that Devon would have any less bias than any of the other witnesses.

{¶60} And finally, we do not find that the testimony of Ms. Ruffing was definitive in impeaching Devon's testimony. We note that Ms. Ruffing never testified that Devon said that he *did not see* Mr. Brofford kick Jonathan. Rather, she testified that, at some unidentified point in time during some unidentified

conversation, Devon did not mention anyone but Tory Stover as an assailant. We do not know what questions were posed to Devon, or in what context his statement may have been made.

**{¶61}** Although this assignment of error represents that Ms. Ruffing's statement was that Devon had said "he had *only* seen Tory Stover kick Jonathan," that is not an accurate representation of the investigator's proffered testimony. She did not say that Devon had definitely stated that he had not seen anyone else kicking Jonathan; she merely said that he had not mentioned anyone else. Without knowing more about the context and details of the alleged statement, her proffer does not definitively impeach Devon's testimony. Therefore, given all of the other evidence against Mr. Brofford, and the inconclusiveness of Ms. Ruffing's supposed impeachment testimony, the exclusion of her testimony would have been harmless error, if it had been error at all.

**{¶62}** Accordingly, for all of the above reasons, Mr. Brofford's fourth assignment of error is overruled.

*Fifth Assignment of Error-*
*Merger of Felonious Assault and Complicity*

**{¶63}** The final assignment of error suggests that the trial court erred by finding Mr. Brofford guilty and sentencing him on two separate counts for both felonious assault and complicity to commit felonious assault. Mr. Brofford

contends that these two counts should have been merged because they were allied offenses of similar import, and it was error to sentence him on both counts.

**{¶64}** R.C. 2903.11, felonious assault, states that "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn." "Complicity" is defined in R.C. 2923.03 as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

**{¶65}** At the time of sentencing, Mr. Brofford's counsel asked the trial court to treat the two offenses as allied offenses of similar import and have the State elect one for sentencing. The trial court overruled the defense motion. The State made the following argument against merger at that time.

Your Honor, in speaking to [defense counsel's] assertions that these are allied offenses, the State respectfully disagrees. There's a separate animus in each offense. One for the actions that Mr. Brofford took in kicking [Jonathan]. And a separate animus for encouraging others, which he was convicted of separately. Complicity, aid, abet, encourage, or solicit. Which he encouraged others to participate in this attack. That's a separate animus from the action that he took [himself] and he should be punished separately.

(Tr. 10/4, p. 14)

**{¶66}** Mr. Brofford argues that these two separate counts should have "merged" because he claims that the two offenses are allied because they were part of a single event concerning the same assault on Jonathan that occurred the night of January 22-23 at the Brofford's residence. And, he contends that there was no separate animus because the "immediate motive" for both offenses was to cause harm to Jonathan.

**{¶67}** The statute governing multiple counts in an indictment is R.C. 2941.25, which provides as follows:

> A. Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> B. Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶68}** The Supreme Court of Ohio has set forth the test for determining whether two crimes are allied offenses of similar import in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. In *Johnson*, the Supreme Court of Ohio emphasized the importance of considering the defendant's conduct:

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to

commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that *the conduct of the defendant* constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Emphasis added.) *Johnson* at ¶¶ 48-51. The term "animus" has been held to "mean purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131 (1979).

**{¶69}** Mr. Brofford attempts to argue that there was a single event, namely "an assault on Jonathan." However, according to *Johnson*, we must look at the "conduct of the defendant." *Johnson* at ¶ 48. In analyzing Mr. Brofford's actions during the evening, it is apparent that he committed the two offenses with two

very different acts.  The first act was the incitement of the co-defendants[8] to attack Jonathan, and the second act was his own participation in the assault on Jonathan.

{¶70} The conduct in inciting the others to "get them boys; teach those boys a lesson" (Tr. 8/23, pp. 150-151) resulted in the assault on Jonathan by Tory, Wesley, and the others.  This incitement occurred at the beginning of the assault, while Mr. Brofford was chasing Luke around a car trying to hit him and this conduct resulted in the indictment for complicity.  *See* R.C. 2923.03 *supra*.  The second act was the assault by Mr. Brofford himself, when he personally kicked Jonathan.  (Tr. 8/23, pp. 153-154).

{¶71} The trial court did not commit any error in sentencing Mr. Brofford for each crime separately, because each act was separate and had a different animus.  The fifth assignment of error is overruled.

{¶72} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**

---

[8] Charges were also filed against four or five of the others that participated in the assault.  Only Wesley's and Mr. Brofford's cases were tried together in this trial.