SEAN C. GALLAGHER, J., DISSENTING:
{¶ 35} Unfortunately, we are back where we started. State v. Jones , 2016-Ohio-7702, 76 N.E.3d 596 (" Jones II" ), should remain the decision in this case, and the en banc court is evenly split over a resolution to the conflict. There have been three characterizations of the conflict between State v. Ongert , 8th Dist. Cuyahoga No. 103208, 2016-Ohio-1543, 2016 WL 1464227, and Jones II :
• The state asked whether Marcum permits a more expansive, appellate review process, in which an appellate court may independently consider and weigh the sentencing factors under R.C. 2953.08 (G).
• The panel in this case asked whether Marcum read R.C. 2929.11 and 2929.12 into subdivision (A)(4) of R.C. 2953.08 -in determining whether the sentence unsupported by the record was contrary to law.
• Supplemental briefing was also sought on whether Marcum read R.C. 2929.11 and 2929.12 into subdivision (G)(2)(a) of R.C. 2953.08.
We were unable to reach a majority position on the first two issues, although a majority resolved the last. As explained below, we need not address the en banc court's characterization of the conflict because the answer to the question posed is irrelevant to the outcomes in the conflict cases. In any event, Jones II and the new opinion issued by the panel incorrectly weigh and independently review the sentencing factors without deference to the trial court, in effect creating a new standard of appellate sentencing review. From this, I must dissent.
A. The En Banc Court's Characterization of the Conflict
{¶ 36} Ongert and Jones did not disagree with respect to whether State v. Marcum , 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, incorporated R.C. 2929.11 and 2929.12 into the appellate review codified under R.C. 2953.08(G). In both cases, the panels acknowledged Marcum , in which it was held that an appellate court may review a sentence that is not contrary to law and is imposed solely after consideration of the statutory sentencing factors under the deferential review codified in R.C. 2953.08(G). Both panels recognized that R.C. 2929.11 and 2929.12 are part of the R.C. 2953.08(G) review process. Ongert at ¶ 13 ; Jones at ¶ 102. Upon consideration of this entire appeal as required under App.R. 26(A)(2)(a), the supplemental briefing was improvidently requested because the issue as presented fails to articulate a dispositive issue upon which the two cases conflict.
{¶ 37} That, however, is the only issue upon which a majority of this court agrees. There is no en banc majority decision on any other aspect of Jones II nor one that alters the panel's decision in light of the fact that Jones II already set forth the proposition on which the fractured majority agrees. "In the event a majority of the full-time judges of the appellate district is unable to concur in a decision, the decision of the original panel shall remain the decision in the case * * *." (Emphasis added.) App.R. 26(A)(2)(d). As a result, Jones II should remain the decision in the case *717 unaltered-the panel's decision cannot be vacated or altered by less than a majority of this en banc court. State v. Anderson , 148 Ohio St.3d 74, 2016-Ohio-5791, 68 N.E.3d 790, ¶ 13 (discretionary review of intradistrict conflict accepted following a split en banc decision); but see State v. Amos , 140 Ohio St.3d 238, 2014-Ohio-3160, 17 N.E.3d 528, ¶ 8, 29 (it is contrary to the administration of justice for an appellate court to announce two directly opposing views on the same issue and not resolve those conflicts under App.R. 26 ).
B. The Jones II Panel's Characterization of the Conflict
{¶ 38} In Jones II, the panel claimed a conflict existed with respect to whether Marcum read R.C. 2929.11 and 2929.12 into division (A)(4) of R.C. 2953.08 in determining whether the sentence unsupported by the record was contrary to law. Jones II at ¶ 108. Jones II and the concurring opinion interpret Marcum to mean that a sentence being unsupported by the record is contrary to law under R.C. 2953.08(A)(4). Jones II at ¶ 108. In Ongert , the opposite was held. Id. at ¶ 12 (a sentence cannot be deemed contrary to law because the defendant disagrees with the trial court's discretion exercised in weighing the individual sentencing factors).
{¶ 39} It is important to note that in Marcum , it was held that the defendant's "ten-year prison term is not clearly and convincingly contrary to law. Accordingly, the Fourth District could have modified or vacated her sentence only if it found by clear and convincing evidence that the record did not support the sentencing court's decision." (Emphasis added.) Id. at ¶ 7, citing R.C. 2953.08(G)(2). Moreover, the Ohio Supreme Court has since "held that R.C. 2953.08(G)(2) allows an appellate court" to reverse a sentence "only when it clearly and convincingly finds that the sentence is (1) contrary to law[8] or (2) unsupported by the record."[9] (Emphasis added.) State v. Brandenburg , 146 Ohio St.3d 221, 2016-Ohio-2970, 54 N.E.3d 1217, at ¶ 1, citing Marcum at ¶ 7. Had there been an intention to equate a sentence that is unsupported by the record with one that is contrary to law, the holding of Marcum would not have been treated as a disjunctive one.[10]
{¶ 40} It is conceivable that Marcum could be limited in application to sentences *718 that are reviewable under R.C. 2953.08(A)(1)-(5). State v. Underwood , 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 10 (a defendant must first demonstrate that the sentence is reviewable under one of the provisions of R.C. 2953.08(A) ). However, it cannot be ignored that the sentence under review in Marcum itself fell into the unreviewable category under R.C. 2953.08(A)(1)-(5). The sentence being reviewed was not contrary to law. Marcum at ¶ 7 ; State v. Marcum , 2014-Ohio-4048, 19 N.E.3d 540, ¶ 23 (4th Dist.) (defendant conceded her sentence was not contrary to law). Further, the sentence was a 10-year term, imposed on a first-degree felony drug offense, the maximum sentence for which was 11 years. Marcum at ¶ 4. Some length of the prison term was mandatory under R.C. 2925.04(C)(3) for the offense at issue, and therefore, R.C. 2929.13(B) (discretionary prison terms in lieu of community control sanctions) was not specified as being applicable and the sentence did not consist of an additional prison term imposed under R.C. 2929.14(B)(2)(e). See id.
{¶ 41} No provision under R.C. 2953.08(A) authorized any court to review the sentence in Marcum , but the sentence was nonetheless reviewed and the appellate court's own review of that sentence was affirmed. Marcum at ¶ 24. It therefore suffices that an appellate court may review a sentence that is not contrary to law and was imposed solely after consideration of R.C. 2929.11 and 2929.12 under R.C. 2953.08(G). Marcum at ¶ 23. In both Ongert and Jones II , it was noted that irrespective of division (A) of R.C. 2953.08, appellate courts can review a sentence that is not contrary to law and imposed solely upon consideration of R.C. 2929.11 and 2929.12 under R.C. 2953.08(G). Ongert at ¶ 13 ; Jones II at ¶ 109-117. Marcum itself stands for this proposition without reference to R.C. 2953.08(A)(4). Marcum at ¶ 23. Any discussion regarding how Marcum fits into the framework of R.C. 2953.08(A) is an issue left for a later date when properly preserved and argued by the parties.
{¶ 42} "Consideration en banc is not favored and will not be ordered unless necessary to secure or maintain uniformity of decisions within the district on an issue that is dispositive in the case in which the application is filed." App.R. 26(A)(2). We need not resolve the panel's question because in both Ongert and Jones II , the panels concluded that Marcum controlled; as a result, any answer to the panel's question would be superfluous in light of the posture of this case.
C. The State's Characterization of the Conflict
{¶ 43} In Ongert , the panel concluded that an appellate court cannot independently *719 consider the weight of the sentencing factors because an appellate court must defer to the trial court's consideration of the sentencing factors, and the sentence was affirmed. Id. at ¶ 14. Jones II held that upon an independent review of the sentencing factors and the weight to be given to those factors, the underlying, nonmaximum sentence must be reversed. Id. at ¶ 109-117. These outcomes are irreconcilable.
{¶ 44} As a result, we should be addressing the conflict as presented by the state: whether Marcum altered the appellate standard of review under R.C. 2953.08(G) to permit a more expansive appellate review process that permits an appellate court to independently consider the sentencing factors and independently determine the most effective way to comply with R.C. 2929.11. In Jones II , the panel independently found that imprisoning the victim's parents for ten years does not advance the two primary purposes of felony sentencing under R.C. 2929.11 and such a determination can be made without regard to the trial court's sentencing statements and discretion. Jones II at ¶ 113-117.
{¶ 45} Since Marcum, a majority of districts have rejected that approach and recognized that appellate review is deferential. State v. Cochran , 2d Dist. Clark No. 2016-CA-33, 2017-Ohio-217, 2017 WL 275876, ¶ 13 (trial court has discretion to weigh sentencing factors, and the trial court is free to conclude that other factors outweighed the defendant's remorse); State v. Ward , 2017-Ohio-4381, 93 N.E.3d 134, ¶ 6 ( Marcum does not authorize appellate courts to independently weigh sentencing factors); State v. Stovall , 8th Dist. Cuyahoga No. 104787, 2017-Ohio-2661, 2017 WL 1742998, ¶ 31 (concluding that under Marcum , appellate courts have no authority to review how the trial court weighed the sentencing factors); State v. Allen , 9th Dist. Summit Nos. 27494 and 28213, 2017-Ohio-2831, 2017 WL 2257954, ¶ 31 (sentence affirmed because the trial court considered the sentencing factors); State v. Madison , 10th Dist. Franklin Nos. 15AP-994 and 15AP-995, 2016-Ohio-7127, 2016 WL 5720378, ¶ 19 (same); State v. Sprott , 11th Dist. Ashtabula No. 2016-A-0066, 2017-Ohio-1508, 2017 WL 1483868, ¶ 15 (appellate court must defer to trial court's consideration of remorse); State v. Napier , 12th Dist. Clermont No. CA2016-04-022, 2017-Ohio-246, 2017 WL 283473, ¶ 46 (trial court's consideration of the sentencing factors is sufficient to affirm sentence, and defendant failed to demonstrate that the sentence was not clearly and convincingly supported by the record).
{¶ 46} In this case, the trial court went above and beyond at sentencing, expressly setting out the reasons for imposing the sentence based on a thorough review of the entire record and the interaction with the defendants during a lengthy sentencing hearing. The Joneses have failed to cite any portion of the record demonstrating that the trial court's considerations of any of the sentencing factors are unsupported by the record. In order to reverse a sentence, much more is required if we are to give effect to the deferential standard of review announced in Marcum . Marcum does not expand R.C. 2953.08(G) to allow appellate courts to independently weigh the sentencing considerations or factors to reach an independent conclusion as to the sentence a defendant deserves. Ongert, 8th Dist. Cuyahoga No. 103208, 2016-Ohio-1543, 2016 WL 1464227, at ¶ 14 ; State v. Brown , 7th Dist. Mahoning No. 16 MA 0059, 2017-Ohio-7704, 2017 WL 4167411, ¶ 33 ; Madison at ¶ 19.
{¶ 47} Trial courts have been granted the discretion to determine the most effective way to comply with R.C. 2929.11. Appellate *720 courts must defer to that broad discretion. State v. Rahab , 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 10, citing Wasman v. United States , 468 U.S. 559, 563-564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984), and Williams v. New York , 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). We, as appellate judges, cannot substitute our judgment for that of the trial court, and therefore, an appeal begins with the presumption that the trial court considered the appropriate sentencing criteria. Rahab at ¶ 19, citing State v. O'Dell , 45 Ohio St.3d 140, 147, 543 N.E.2d 1220 (1989). "[T ]he entire record-the trial court's statements , the evidence adduced at trial, and the information presented during the sentencing hearing" must be reviewed to determine whether it can be clearly and convincingly found that the record does not support the findings or sentence under R.C. 2953.08(G)(2). (Emphasis added.) See Rahab at ¶ 19 ; R.C. 2953.08(A) eff. Jan. 1, 1997. This is a high burden to meet.
{¶ 48} Once the trial court's sentencing statements are considered in this case, it is beyond dispute that the court considered what was required by law and that which was deemed relevant by the parties. In fact, neither defendant advanced any claim that the record did not support the sentence-the sole argument presented for review was that the sentences were contrary to law because the trial court failed to consider R.C. 2929.11 and 2929.12, a proposition definitively rejected through even a cursory review of the record. Nevertheless, even if the Joneses had properly framed their argument under Marcum , the trial court's considerations and conclusions are amply supported by the record.
{¶ 49} The trial court considered the defendants' lack of a criminal record, the letters submitted by the defendants regarding their character, and the defendants' support within their community. Tr. 1929:22-24; 1931:23-1932:8. The trial court discounted the defendants' support, however, and noted that none of their supporters saw the evidence at trial or the state of the victim before expressing their support. Tr. 1964:4-21. It was within the trial court's discretion to do so.
{¶ 50} The victim did not suffer lightly before death-a stand-alone consideration for sentencing. Tr. 1165:11-16 (death classified as homicide because conditions the victim suffered would have been painful). The trial court was struck by the fact that the emergency room physician, one who has seen tragedy in his career, was moved to tears when relating the severity of the victim's suffering to the jury, a tragedy that should not have happened because simple medical intervention early would have prevented the death. Tr. 1939:24-1940:11; 816:18-817:2. In addressing the defendants' remorse, the trial court noted that the defendants' claim that they did not recognize the severity of the child's plight, until it was too late to save her, was nothing short of incredible. Tr. 1947:1. In the trial court's own words:
I've never seen-I have-I have been a lawyer and a judge now for almost 17 years and I have never seen, in my career-in my top 5 these are the worst photographs of a child that I have ever seen, and I have seen countless autopsy photos of murders of babies. And for this to be in my top 5, I can't-I can't wrap my mind around the idea that you-that you are suggesting that you didn't see that. That those series of photographs that we saw from the minute that your child was dead that you-somehow you missed this.
Tr. 1947:3-14.
{¶ 51} On this point, the court found it important that the victim was found with over 80 marks, scars, bruises, cuts, deep *721 wounds, and foot blisters at the time of her death. Tr. 1952:7-13. The trial court then listened while Randy Jones explained that the scratches were minor and that the child had thrown a "tantrum" that caused the blisters. Tr. 1953:4-6; 1954:13-23. The trial court found the defendant's statement incredulous-"So you're telling me that your child, your 12-year-old child had a tantrum so significant that she caused the damage that we saw in those photos? And you recognize that I have seen the worst photos that humanity has to offer. And that's your explanation?" Tr. 1955:14-20. The court then noted that the "scratch" Randy Jones had so callously referred to was actually a cut that appeared to be caused by a "huge knife." Tr. 1965:15-19.
{¶ 52} To make matters worse, the defendants stated that the reason they failed to take the child to the emergency room earlier was because they relied on a website to diagnose and care for the child. Tr. 1957:14-18. Upon hearing such a statement, the trial court inquired why the defendants failed to accept responsibility for their actions and demonstrate any remorse, knowing what they knew after the fact. Tr. 1958:22-1960:18. Neither had an answer, but continually maintained that they were not aware of the severity of the child's medical plight, despite the fact that the necrosis (dead tissue) the child was found with was so severe that the treating doctor and investigating detective were able to note the condition from the odor alone that filled the room. Tr. 810:12-15; 1963:12-25. The necrosis had been allowed to fester for up to four weeks, and the odor would have been noticeable in as little as two. Tr. 817:10-20. During all of this, the defendants maintained that they believed the victim was suffering from a simple cold-although Carissa willingly sought medical treatment for her own cold symptoms during the same period of time despite the fact that the skin was not rotting off her body.
{¶ 53} It was not until the end of a lengthy sentencing dialogue that Carissa and Randy Jones finally expressed any degree of remorse for their actions. Tr. 1981:14-17; 1982:4-17. By then, it was too late. The court noted that the child "died a very painful death," and yet the court had not seen either defendant shed "one tear about the death of your child in front of me." Tr. 1987. Nevertheless, the trial court considered the belated statements, but found after giving "this case more thought than just about any case that I've ever had in my career," and despite the fact that the defendants were "two people that could be just like everybody else," that their conduct was so egregious, the injuries and abuse so severe, that a 10-year sentence was appropriate. See, e.g., State v. Flannery , 6th Dist. Erie No. E-14-017, 2015-Ohio-388, 2015 WL 447604 (11-year prison term for mother who permitted child to be abused by another); State v. Piggee , 8th Dist. Cuyahoga No. 101331, 2015-Ohio-596, 2015 WL 754986 (7-year prison term for mother convicted of permitting child abuse). The trial court was so thorough with the sentencing considerations that none of the trial court's considerations are referenced by either defendant. The record amply supports the sentence. I would affirm.
{¶ 54} There are two salient points we must remember. First, like the ones imposed here, sentences that are based solely after consideration of the R.C. 2929.11 principles and the 2929.12 factors are presumptively proportional. They fall within the prescribed range authorized by the legislature. They are not imposed on a consecutive basis. They do not involve a maximum sentence. And more importantly, under Marcum , they are not contrary to law.
*722 {¶ 55} Second, reversing sentences like these where there is evidence in the record supporting the trial court's determination undermines finality in the criminal justice system and creates the dangerous precedent of turning appellate panels into second-tier sentencing courts, without the benefits of interacting with the defendants and sitting through the entire proceeding. These sentences should be disturbed only where the appellate panel finds that the record clearly and convincingly does not support the sentence imposed. This approach does not eliminate "meaningful" review. To claim as much would be to ignore the right of the legislature to establish the punishment ranges for offenders and the trial court's authority, discretion, and duty to sentence within those parameters. The key point is that the record ensures the sentence is fair and equitable but within the framework of legislative authority. The Joneses' sentences meet that requirement.
LARRY A. JONES, SR., P.J.:
DECISION OF THE MERIT PANEL:
I. Statement of the Case
Background
{¶ 56} The victim in this case was the Joneses' 12-year old daughter, T.J., who passed away on February 18, 2013. The Joneses, Florida natives, adopted T.J. in Florida in 2002 when she was approximately eight months old. They made the decision to adopt because Carissa had Lupus, an autoimmune disorder, which she was successfully managing with medication at the time she and Randy wished to start a family. Attempting to get pregnant would have required her to go off her medications, which she did not want to do. The family moved to Cleveland in 2006 for Randy's job.
{¶ 57} Shortly after they relocated in Cleveland, T.J. was diagnosed with autism, attention deficit hyperactivity disorder ("ADHD"), and mild developmental delays. Her parents initially gave her medications to treat the issues, but eventually discontinued doing so because they believed the medications were not working. T.J. also had difficulty communicating and understanding other people. Her parents took her to a psychologist for the communication issues, but stopped doing so in 2009.
{¶ 58} T.J. saw a pediatrician in 2007 as part of her school registration, but did not see any doctors after 2009 because, according to Randy, she was "never sick." T.J. had self-injurious behavior and self-picking issues. According to Randy, he and Carissa learned from medical professionals how to deal with the issues and thereafter were able to help T.J. on their own. T.J. was also prone to developing blisters on her body. Randy, who had military experience treating injuries, tended to T.J.'s blisters. According to her parents, T.J. had a high pain tolerance.
{¶ 59} T.J. initially went to a traditional school, but her parents did not feel it was working for her and, therefore, after the second grade, Carissa, a teacher, home schooled her. An area in the basement of the family's home was set up similar to a classroom and was where T.J. was schooled.
{¶ 60} Randy testified at trial. He told the jury that T.J. first started getting blisters on her body when she was three or four years old; he and Carissa noticed them one day after T.J. had been in daycare. They never got a definitive answer as to why T.J. would get them but, as mentioned, Randy would treat them and, according to him, they would generally heal in 10 to 14 days. Randy testified that his treatment of the blisters involved applying a topical antibiotic (Neosporin), hydrogen peroxide, rubbing alcohol, and a mixture of "home" remedies, including a salve containing garlic and cayenne pepper. He would daily clean the wounds and, because *723 of T.J.'s picking issues, he would also bandage them daily.
The Days Leading up to T.J.'s Death
{¶ 61} On February 10, 2013, T.J. and Carissa were both sick with colds. T.J. also had blisters on her feet. Randy and Carissa did not seek professional treatment for T.J.; they treated her at home as they had always done. However, at Randy's urging, Carissa went to an urgent care center for her cold. Randy testified that, on and off since January 2013, Carissa had been fighting a cold which caused her to cough up mucus and because of her inability to shake it, coupled with her Lupus, he urged her to seek professional medical treatment. Carissa was prescribed an antibiotic and she filled the prescription.
T.J.'s Death
{¶ 62} T.J. died on a Monday, and the Sunday immediately preceding was the NBA's All-Star Game. Randy testified that it was a family tradition to watch the game and celebrate. According to Randy, on that Sunday, T.J. was getting back to her normal self, appeared to be clear of any cold symptoms, and joined in the festivities. Randy testified that, because of the day's festivities, he did not remove the bandages on T.J. or clean her wounds that day. When T.J. went to sleep that evening she appeared to be fine but awoke in the early morning hours, complaining of a pain in her side. Randy thought she had probably overdone it during the festivities so he gave her a heating pad and took her temperature, which did not indicate a fever. He laid down with her for a while, but left her room when Carissa suggested that T.J. would get more rest if he were not there.
{¶ 63} Randy went to sleep in another bed but was awakened by Carissa screaming. He found Carissa in T.J.'s room; T.J. was unresponsive. Randy performed CPR on T.J., who vomitted. Carissa called 911. The 911 dispatcher testified at trial, and Carissa's call to 911 was played for the jury. The dispatcher described hearing Randy in the background, sounding "panicked," and heard him say "I knew it, I knew it." Randy testified that he said "I knew it" to mean that he knew he should not have left T.J. that morning to sleep in another bed. According to the dispatcher, although Randy was "panicked," Carissa was "calm."
{¶ 64} T.J. was transported by ambulance to an emergency room where, among others, Dr. Jamal Alarafi, attended to her and she passed away shortly after arriving at the hospital. Dr. Alarafi testified that he smelled necrotic, or dead, flesh on T.J. Dr. Alarafi did not remove the bandages on T.J.'s feet, but described them as "dirty," observed pus draining from T.J.'s feet, and observed an abscess on her leg. The doctor believed that it would have taken days and weeks of non-management of the wounds for them to develop to the point that they had, and that the smell would have been noticeable within one to two weeks. After viewing pictures of the wounds with the bandages removed, Dr. Alarafi admitted that they depicted wounds in various stages of healing.
{¶ 65} Over the defense's objections, Dr. Alarafi was permitted to testify that it was his opinion that T.J. was malnourished.[11] He testified that her stomach was distended, and that she was very small and emaciated. The doctor admitted that he did not know if T.J. had always been a small child and that he did not look at any growth charts.
{¶ 66} In speaking with Randy and Carissa after T.J.'s death, Dr. Alarafi found *724 Carissa to be "kind of indifferent," and found that "very strange." According to the doctor, Randy told him that T.J. had had a cold and had recently complained of chest pain, they were treating her with over-the-counter medicine, and they did not believe in modern medicine. The statement regarding disbelief in modern medicine was not reflected in the doctor's notes, however, and Randy testified that he never said that and that he and Carissa did believe in modern medicine. Dr. Alarafi also initially testified that Randy told him that T.J. had not been immunized but, later admitted, after reviewing his notes, that Randy said he was not sure whether she had been immunized; the record indicates that T.J. had, in fact, been immunized.
{¶ 67} Dr. Alarafi opined that T.J. "probably" would have survived if a medical professional had been involved in her care. He testified that T.J.'s condition "shocked" him, that he had been in medicine for over 20 years, and T.J.'s situation was the "worst case I've ever seen of anything like this." Dr. Alarafi contacted the police to investigate T.J.'s death.
{¶ 68} Officer Timothy Casto spoke with Randy at the hospital. Randy told him that he and Carissa had taken T.J. to a doctor a month earlier for a physical, but Randy was unable to tell the officer the doctor's name or office location.
Autopsy
{¶ 69} An autopsy was performed on T.J.'s body on February 19, 2013, the day following her death. Deputy medical examiner Dr. Andrea McCollum, who supervised the autopsy, testified at trial. The cause of death was "polymicrobial sepsis," "acute necrotizing bronchopneumonia," and "staphylococcus, left leg abscess" and the manner of death was designated as homicide.
{¶ 70} Dr. McCollum explained that T.J. had an abscess, or a swollen area filled with pus, in her left leg near her ankle. The abscess became infected with a bacterium called staphylococcus (a staph infection), the infection festered, traveled into her bloodstream, and caused her to develop severe pneumonia in her lungs.
{¶ 71} Dr. McCollum testified that the manner of death was designated as homicide based on the Joneses' inaction: "[T.J.] was a child. A 12-year old cannot be expected to seek medical attention. * * * They depend on their caregivers to provide that attention for them."
{¶ 72} Dr. McCollum admitted that T.J. could have developed the infection without having had the foot ulcers, and that the infection could have developed within a matter of hours or days. But she also testified that wounds on T.J.'s feet were to the point where T.J.'s tissue was actually dying, and that would have taken days to weeks to progress to that point.
{¶ 73} Further, Dr. McCollum testified about injuries T.J. had on her neck, head, torso, right arms and legs, and left leg, and that T.J. had bedsores. Dr. McCollum also testified that T.J. was in the 10th percentile on the body mass index and below the 5th percentile for stature for age and weight for her age.
{¶ 74} Neither defense counsel for Randy nor Carrisa questioned Dr. McCollum on cross-examination.
{¶ 75} Dr. Thomas Gilson ("Dr. Gilson"), the chief medical examiner for Cuyahoga County, also testified as follows to elaborate on the homicide manner of death designation:
We felt that this was an instance of medical negligence as the result of a caregiver not providing adequate care to this child. A reasonable person would have sought treatment for this child.
*725 This child had gangrene on her feet. She had an abscess. These are conditions that would have been painful. * * * They would have been foul-smelling.
{¶ 76} According to Dr. Gilson, T.J. also would have been "coughing, bringing up phlegm," and would have appeared "very sick." Dr. Gilson admitted that a person can develop sepsis, as T.J. had, and die suddenly from that. But it was his opinion that that did not occur in this case. Specifically, he testified that the evidence from the autopsy findings indicated that T.J. did not die from "necrotizing fasciitis," which occurs when bacteria "seed" then quickly proliferate in the fascia (tissue that surrounds the muscle), before causing sepsis. The doctor also testified that he did not observe any active bedsores on T.J.'s body.
{¶ 77} Counsel for Randy did not cross-examine Dr. Gilson and Carissa's counsel cross-examined him only as to the autopsy procedure.
Investigation into T.J.'s Death
{¶ 78} One of the officers who responded to the Joneses' home as a result of the 911 call photographed the home. The photographs showed various over-the-counter medications and supplies in T.J.'s room. Also found in T.J.'s room was Carissa's antibiotic prescription, which had been filled at a CVS Pharmacy on February 10, 2013. Randy denied that either he or Carissa had given the antibiotic to T.J., and the laboratory results from the autopsy were inconclusive as to the issue.
{¶ 79} In March 2013, Paul Sturman ("Sturman"), an investigator for the Cuyahoga County Department of Children and Family Services ("CCDCFS"), interviewed the Joneses at their home. Sturman testified that the Joneses were cooperative and still in shock and grieving. He viewed the schooling area for T.J. and found it to be adequate and appropriate. A day-by-day calendar in the schooling area showed the date of "January 7." Sturman testified about T.J.'s history, the days leading up to her death, and the day of her death, the sum and substance of which was generally the same as has already been stated.
{¶ 80} Sturman also questioned the Joneses about the other injuries on T.J.'s body. The Joneses told him that they attributed them to T.J.'s self-injurious behavior. Randy also told Sturman that it was like "pulling teeth" to get T.J. to tell them how she got her injuries, and so they set up a camcorder to help them learn. Further, Randy also said that because of her high tolerance for pain, T.J. could get burned or blisters without calling out in pain. The Joneses also told Sturman that T.J. was a "hefty eater," but just did not gain weight.
{¶ 81} Detective Darren Porter was assigned to investigate the case. He was called to the scene after the 911 call and arrived when T.J. was in the ambulance. Detective Porter testified that he did not smell any odors in the home except for vomit. He saw food in T.J.'s bedroom. The detective also went to the hospital, and testified that when he entered the examination room where T.J.'s body was he immediately smelled something foul. He also testified that he saw Randy at the hospital and he was "highly emotional."
The Defense's Case
Randy's Case
{¶ 82} As mentioned, Randy testified at trial. In addition to himself, he presented seven other witnesses. One of the witnesses, Dr. Janice Ophoven, a pediatric forensic pathologist, testified as an expert witness.
{¶ 83} Dr. Ophoven testified that bacteria can cause a rapid and fatal infection in just a few hours, and that with an infection, no one can predict a time line. She *726 opined that if the infection had been in T.J.'s body for an extended period of time, it would have traveled into T.J.'s deep tissue and bones, and there was no evidence of that. Dr. Ophoven found Randy's treatment of T.J.'s blisters appropriate and testified that his home remedy would have likely reduced the amount of pain T.J. experienced. The doctor also did not find any evidence of abuse or malnutrition of T.J. She testified that anyone undergoing approximately 45 minutes of CPR, as T.J. had, would have a distended stomach.
{¶ 84} After her review of this case, which included the autopsy protocol, Dr. Ophoven agreed with the medical examiner's determination as to the cause of T.J.'s death, but disagreed with the homicide designation as the manner of death. According to Dr. Ophoven, T.J. died of natural causes as a result of the bacteria spreading through her body. Dr. Ophoven testified that she believed that the Joneses were unaware of how sick T.J. was, and that they were not neglectful by not taking her to a doctor because "you don't take your kid to the doctor to discover unknown diseases if they don't have signs and symptoms of diseases." But the doctor also admitted that there was a "component of delay in seeking medical attention," and that a "typical" family would have sought medical treatment. She attributed the other injuries on T.J.'s body as the result of T.J.'s self-picking.
{¶ 85} Dr. Ophoven also testified that there is debate within the forensic pathology community over the use of the term "homicide." She believed that defining homicide as "being death at the hands of another" is "oversimplified." The doctor gave the example of backing over a child in a driveway; she opined that that would be an accident, rather than a homicide.
{¶ 86} Randy's remaining witnesses were character witnesses, who collectively testified that the Joneses had a loving and nurturing relationship with T.J., that they never noticed anything was amiss with the family, and that they were shocked by the charges brought against Randy and Carissa.
Carissa's Case
{¶ 87} Carissa did not testify, but presented one witness, her cousin. The cousin testified that Randy was the "emotional" one in the relationship, while Carissa was the "stern" one.
State's Rebuttal Witness
{¶ 88} The state presented one rebuttal witness, a parishioner from the Joneses' church. According to the parishioner, the Jones family "secluded" themselves and T.J. appeared to be afraid of Carissa. The parishioner testified that she once noticed that T.J.'s ankles appeared to be swollen, but she could not qualify when that was. She admitted, however, that T.J. never appeared to have any mobility issues and she never felt the need to contact CCDCFS.
Verdict and Sentence
{¶ 89} On the above evidence, the jury found Randy and Carissa each guilty of involuntary manslaughter, permitting child abuse, and two counts of endangering children. The jury found them both not guilty of one count of endangering children.[12] The parties agreed that the counts all merged, and the state elected to proceed to sentencing under the involuntary manslaughter count. Neither Randy nor Carissa had a criminal history. As mentioned, the trial court sentenced each to a ten-year term in prison. This appeal ensued.
*727 II. Assignments of Error
Randy's Assignments of Error
I. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 for involuntary manslaughter because the charge is not supported by sufficient evidence.
II. Appellant's convictions were against the manifest weight of the evidence.
III. The trial court committed reversible error when permitting opinion testimony for a witness that was not qualified as an expert.
IV. The trial court erred by denying defense requests for jury instructions and for providing improper and incomplete instructions over objection.
V. The ten-year prison sentence rendered by the trial court judge is contrary to law and not supported by the record.
Carissa's Assignments of Error
I. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.
II. Appellant's convictions are against the manifest weight of the evidence.
III. Appellant was deprived of due process and a fair trial when the state introduced irrelevant, prejudicial, other acts evidence and hearsay in violation of Evid.R. 401, 402, 403, 404, 602, 701 and 702, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.
IV. The trial court erred by denying defense requests for jury instructions and for providing improper and incomplete instructions over objection.
V. The ten-year prison term is contrary to law and is not supported by the record.
III. Law and Analysis
Sufficiency of the Evidence
{¶ 90} At the conclusion of the state's case and the conclusion of the defense's case, both Randy and Carissa made Crim.R. 29 motions for judgments of acquittal, which the trial court denied. In their first assignments of error, Randy and Carissa contend that the trial court erred in denying their Crim.R. 29 motions. Both contend that the evidence was insufficient to demonstrate that they acted recklessly, the mens rea for the crimes, and that the evidence was insufficient to demonstrate that their actions/inactions were the proximate cause of T.J.'s death.
{¶ 91} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. State v. Thompkins , 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997) ; State v. Jenks , 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). " 'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Thompkins at id.
{¶ 92} The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; Jenks at id.
*728 A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.
R.C. 2901.22(C).
{¶ 93} This court has held, under the substantively same definition of reckless, that a parent may be found to be reckless for failing to seek medical treatment for an injured or ill child. State v. Reynolds , 8th Dist. Cuyahoga No. 65342, 1994 WL 449743, 10 (Aug. 18, 1994) ; see also State v. Scott , 3d Dist. Hardin No. 6-07-17, 2008-Ohio-86, 2008 WL 115016 ; State v. Stewart , 5th Dist. Stark No. 2007-CA-00059, 2007-Ohio-6118, 2007 WL 3408297 ; State v. Stewart , 5th Dist. Stark No. 2007-CA-00068, 2007-Ohio-6177, 2007 WL 4105597 ; State v. Traster , 9th Dist. Summit No. 17548, 1996 WL 603850 (Oct. 23, 1996) ; State v. Sandefur , 9th Dist. Summit No. 15787, 1993 WL 303279 (Aug. 11, 1993).
{¶ 94} Upon review, we find that the state presented sufficient evidence as to the Joneses' recklessness. The record demonstrates that since 2009 they did not have T.J. under any medical care, including during the time of her illness immediately preceding her death. In finding the evidence sufficient to support the convictions, we note that it was not necessary for the state to prove that Randy and Carissa knew specifically what medical condition T.J. had or that it would lead to her death. Rather, under R.C. 2919.22, the endangering children statute, the state was only required to prove that the Joneses, through their inaction, created a "substantial risk to the health or safety" of T.J.
{¶ 95} Dr. McCollum testified that the gangrenous wounds on T.J.'s feet had developed for days or weeks and were to the point where the tissue was dying. Dr. Alarafi also testified that the wounds had to have been present for a period of time to have deteriorated to the point they had. The three doctors who testified for the state-Drs. McCollum and Alarafi, along with Dr. Gilson-all believed that a reasonable person would have sought medical treatment for the wounds on T.J.'s feet. Drs. McCollum's and Gilson's testimony as to the substantive findings of the autopsy were not challenged by the defense. And, even the defense's witness, Dr. Ophoven, admitted that there was a "component of delay in seeking medical attention."
{¶ 96} Further, at the hospital Randy told the police that he and Carissa had taken T.J. to a doctor one month prior to her death, but admitted during his testimony that T.J. had not been to a doctor in the approximately four years before her death. A reasonable inference could be made from that testimony that the Joneses believed that they should have sought medical treatment for their daughter.
{¶ 97} Another reasonable inference could have been made, based on the evidence that T.J. had bedsores, food was found in her room, and the day-by-day calendar in the schooling area had the date "January 7," that T.J. had become so ill that she was bedridden.
{¶ 98} In light of the above, the state presented sufficient evidence of recklessness.
{¶ 99} We likewise find that the state presented sufficient evidence that the Jones's inaction was the proximate cause of T.J.'s death.
*729 {¶ 100} Criminal conduct constitutes the "proximate cause" of a death, when the conduct "(1) caused the result, in that but for the conduct, the result would not have occurred, and (2) the result [was] foreseeable." State v. Gibson , 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, 2013 WL 5517927, ¶ 36, citing State v. Muntaser , 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, 2003 WL 22455703, ¶ 38. "Foreseeability is determined from the perspective of what the defendant knew or should have known, when viewed in light of ordinary experience." Muntaser at id. Results are foreseeable when the consequences of an action are "natural and logical," meaning "that [they are] within the scope of the risk created by the defendant." Id. , citing State v. Losey , 23 Ohio App.3d 93, 491 N.E.2d 379 (10th Dist.1985).
{¶ 101} The Joneses cite Dr. McCollum's admission that a staph infection can happen even without the type of injuries that T.J. had to her feet as ground that the state failed to prove proximate cause. Although Dr. McCollum did testify that an infection "can happen independently as well," the state presented sufficient evidence that that was not the case here, and that was not Dr. McCollum's opinion. The state presented testimony that the staph infection developed in T.J.'s left ankle and caused bacteria to enter her bloodstream, that traveled to her lungs, caused severe pneumonia, and killed her. Thus, the state presented evidence that, if believed, proved that without the abscess in T.J.'s ankle, there would have been no staph infection and no pneumonia.
{¶ 102} As to foreseeability, the state also presented sufficient evidence that, if believed, would prove that the consequences of the Jones's inaction were "natural and logical." As mentioned, although a person can have a staph infection without visible injuries, the state presented evidence that that was not the case with T.J. Specifically, the state presented evidence about the foul odor that was coming from T.J.'s feet, as well as the appearance of her feet and legs. Thus, the evidence was sufficient to prove that, based on T.J.'s visible injuries, the Joneses knew or should have known that T.J. required medical attention.
{¶ 103} In light of the above, the evidence was sufficient to support the convictions and the Joneses' first assignments of error are overruled.
Manifest Weight of the Evidence
{¶ 104} For their second assignments of error, the Joneses contend that the convictions are against the manifest weight of the evidence. We disagree.
{¶ 105} Weight of the evidence addresses the evidence's effect of inducing belief. State v. Wilson , 113 Ohio St.3d 382, 387-388, 2007-Ohio-2202, 865 N.E.2d 1264. "In other words, a reviewing court asks whose evidence is more persuasive-the state's or the defendant's? Even though there may be sufficient evidence to support a conviction, a reviewing court can still re-weigh the evidence and reverse a lower court's holdings." Id. at 387, 865 N.E.2d 1264. However, an appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541. Accordingly, reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." Id.
{¶ 106} Upon review, we will not usurp the jury's findings in this case. For the reasons already discussed in analyzing the first assignments of error, the jury did not clearly lose its way. In sum, the state's *730 plausible theory of the case was that the Joneses knew or should have known that T.J. was in need of medical treatment, but failed to provide the care for their daughter, and presented evidence to that effect. The defense's plausible position was that Randy and Carissa did not know how sick T.J. was and they treated her themselves, as they had done in the past. The jury believed the state's theory. There is nothing incredible about the jury's determination. Thus, we defer to the jury, who, as fact finder, was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. See Seasons Coal Co. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984) ; State v. DeHass , 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).
{¶ 107} For the reasons stated above, the second assignments of error are overruled.
Evidentiary Rulings
{¶ 108} In their third assignments of error, Randy and Carissa challenge various testimony and evidence allowed by the trial court. We review a trial court's decision regarding the admission of evidence for an abuse of discretion. State v. Conway , 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing State v. Issa , 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). Thus, our inquiry is limited to determining whether the trial court acted unreasonably, arbitrarily or unconscionably in deciding the evidentiary issues. State v. Barnes , 94 Ohio St.3d 21, 23, 759 N.E.2d 1240 (2002).
Dr. Alarafi's Opinion Testimony
{¶ 109} Randy and Carissa both challenge the admission of Dr. Alarafi's opinion testimony on various aspects of T.J.'s condition, contending that it was improper because he did not file an expert report and, therefore, was not an expert witness. Specifically, Dr. Alarafi opined about how long it would have taken for T.J.'s wounds to progress to the point they had and about her general care. He also opined that T.J. was malnourished.
{¶ 110} Evid.R. 701 governs opinion testimony by lay witnesses and provides as follows:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
{¶ 111} The Ohio Supreme Court has addressed the issue of lay witnesses testifying on issues generally reserved for expert testimony, stating the following:
It is consistent with [the] emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.
State v. McKee , 91 Ohio St.3d 292, 296-297, 744 N.E.2d 737 (2001) ; see also *731 State v. Wilkinson , 8th Dist. Cuyahoga No. 100859, 2014-Ohio-5791, 2014 WL 7458246, ¶ 52-53 ; State v. Primeau , 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, 2012 WL 5463019, ¶ 74 ; State v. Cooper , 8th Dist. Cuyahoga No. 86437, 2006-Ohio-817, 2006 WL 439906, ¶ 18.
{¶ 112} Further, under Loc.R. 21.1(C), trial courts have the discretion to determine whether a treating physician's hospital or office records satisfy the requirements of a written report. This court recently addressed this issue, and found that a treating physician's testimony regarding his or her perceptions and observations about a patient is " 'consistent with [the] emerging view under Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702.' " State v. Heineman , 2016-Ohio-3058, 65 N.E.3d 287, ¶ 25, quoting McKee at id.
{¶ 113} Upon review, we find that admission of Dr. Alarafi's opinion testimony was not an abuse of discretion. Dr. Alarafi testified that he had been an emergency room physician for approximately 20 years, and that this was the "worst case" of anything of this nature that he had seen. He was alarmed by what he saw and, therefore, reported it to the police. His testimony about what he found alarming was helpful to explain to the jury why he would report the case to the police. The testimony was further helpful to aid the jury in understanding T.J.'s condition and how sick she was. "It is well established that treating physicians can be called at trial to testify as viewers of their patients' physical condition * * *." State v. Brofford , 3d Dist. Union No. 14-12-08, 2013-Ohio-3781, 2013 WL 4737332, ¶ 35, citing Williams v. Reynolds Rd. Surgical Ctr. , 6th Dist. Lucas No. L-02-1144, 2004-Ohio-1645, 2004 WL 628972, ¶ 6. Any contradiction to Dr. Alarafi's testimony that was drawn through the testimony of the other expert witnesses went to the weight, not admissibility, of Dr. Alarafi's testimony.
{¶ 114} In light of the above, the trial court did not abuse its discretion in allowing Dr. Alarafi's opinion testimony. Randy's third assignment of error, which solely raises the issue of Dr. Alarafi's testimony, is overruled, and the portion of Carissa's third assignment of error relative to this issue is overruled.
Medical Examiner's Manner of Death Testimony
{¶ 115} Carissa also challenges in her third assignment of error Drs. McCollum and Gilson's testimony that T.J.'s manner of death was homicide. Carissa contends that the testimony was improper because it addressed the "ultimate issue" in the case and "inevitably led to jury confusion and impacted the verdicts in this case." We disagree.
{¶ 116} The Ohio Rules of Evidence provide that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.
{¶ 117} R.C. 313.19, governing the coroner's determination as to the legally accepted manner of death, recognizes the quasi-judicial character of the coroner's duties. The statute provides:
The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict * * * shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.
*732 {¶ 118} In Vargo v. Travelers Ins. Co. , 34 Ohio St.3d 27, 516 N.E.2d 226 (1987), the Supreme Court of Ohio held that the "coroner's factual determinations concerning the manner, mode and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." Id. at paragraph one of the syllabus. Thus, it is recognized that "it is clearly within the expertise of the coroner to give an opinion on whether a death is a homicide." State v. Simpson , 11th Dist. Lake No. 93-L-014, 1994 WL 587896, *8 (Sept. 30, 1994), citing State v. Harrison , 1st Dist. Hamilton No. C-920422, 1993 WL 293971 (May 12, 1993).
{¶ 119} In light of the above, Drs. McCollum's and Gilson's testimony was proper. Moreover, the trial court gave the jury a limiting instruction as to their testimony, instructing the jury that their use of the term "homicide" was different than the legal term used in the jury instructions.
{¶ 120} Carissa's third assignment of error, as it relates to Drs. McCollum's and Gilson's testimony is, therefore, overruled.
Testimony about other Injuries T.J. had
{¶ 121} Carissa's third assignment of error further challenges testimony about, and photographs depicting, other injuries (i.e., injuries other than on her feet and leg) T.J. had. Carissa did not object to this testimony and we therefore review for plain error. See Crim.R. 52(B).
{¶ 122} Count 3 of the indictment charged endangering children by "recklessly abusing" T.J. Thus, the testimony and evidence that Carissa now challenges was relevant to that count. After review, we find that the state did not belabor the point about the other injuries, and that the testimony and photographs about them were properly admitted. Therefore, Carissa's third assignment of error, as it relates to testimony and evidence about T.J.'s other injuries, is overruled.
Carissa's Medical Care in the Days Leading up to T.J.'s Death
{¶ 123} Prior to trial, Carissa filed a motion in limine, seeking to bar the state from putting forth evidence that Carissa sought medical treatment for herself in February 2013, when both she and T.J. had colds. The trial court denied Carissa's request to limit the evidence and further denied her request to provide a limiting instruction regarding the evidence. Carissa claims that allowing the evidence was unduly prejudicial.
{¶ 124} Evid.R. 402 provides that relevant evidence is generally admissible, but irrelevant evidence is inadmissible. Under Evid.R. 403, relevant evidence may be excluded on the grounds of prejudice, confusion, or undue delay, and provides as follows:
(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
(B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.
{¶ 125} In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect. State v. Steele , 10th Dist. Franklin No. 95APA01-124, 1995 WL 559930 (Sept. 21, 1995). In order for the evidence to be deemed inadmissible, its probative value must be minimal *733 and its prejudicial effect great. State v. Morales , 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). But although generally "all evidence presented by a prosecutor is prejudicial, * * * not all evidence unfairly prejudices a defendant." (Emphasis added.) State v. Skatzes , 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 107.
{¶ 126} Furthermore, relevant evidence that is challenged as having probative value that is substantially outweighed by its prejudicial effects should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to the party opposing its admission. State v. Maurer , 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).
{¶ 127} Evidence that Carissa treated with a doctor was relevant in this case. It showed that Randy and Carissa knew that when a person is sick, medical care is necessary. It also explained the antibiotic prescribed to Carissa that was found in T.J.'s room. Further, viewing the evidence most favorably to the state as we are required to do, we find that the probative value of the evidence was not outweighed by its prejudicial effect.
{¶ 128} In light of the above, Carissa's final contention in her third assignment of error is without merit, and her assignment is overruled in toto.
Jury Instructions
{¶ 129} In their fourth assignments of error, Randy and Carissa contend that the trial court erred in its instructions to the jury. Specifically, they both contend that the trial court erred in denying their request for an expanded definition of "recklessness." They also both contend that the trial court erred in failing to give the "multiple defendants" instruction.
{¶ 130} Carissa also challenges the trial court's (1) denial of her request for a limiting instruction regarding the medical treatment she obtained for herself in the days leading up to T.J.'s death; and (2) instruction that the medical definition of homicide differed from the legal definition.
{¶ 131} In general, the giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. Taylor , 5th Dist. Holmes No. 12CA18, 2013-Ohio-5751, 2013 WL 6844487, ¶ 34, citing State v. Martens , 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993). Thus, in reviewing a trial court's jury instruction, an appellate court "determines whether the trial court abused its discretion in refusing to give a requested instruction under the facts and circumstances of the case." State v. Brunner , 10th Dist. Franklin No. 15AP-97, 2015-Ohio-4281, 2015 WL 5997062, ¶ 31. Further, we review jury instructions "as a whole." Taylor at id.
Recklessness Instruction
{¶ 132} Randy and Carissa sought to have the trial court instruct the jury on an expanded definition of recklessness out of concern that the jury would apply the ordinary meaning of reckless, rather than its legal definition. In support of their request, they cited State v. Peck , 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263 (10th Dist.), in which the Tenth Appellate District expounded on the definition of recklessness in determining the sufficiency of the evidence. The court declined the Joneses' request, and instead instructed the jury on recklessness as set forth in the Ohio Jury Instructions ("OJI"). We find no abuse of discretion in its instruction.
{¶ 133} A trial court "must act with extreme caution when giving an instruction that is outside the standard Ohio *734 Jury Instructions to ensure that it is a correct statement of the applicable law. This is especially true when the trial court elects to use language from an appellate court opinion, which was not intended to be used as a jury instruction." State v. Jeffers , 11th Dist. Lake No. 2007-L-011, 2008-Ohio-1894, 2008 WL 1777846, ¶ 49.
{¶ 134} The OJI instruction the trial court provided read as follows: "A person acts recklessly when, with heedless indifference to the consequences, he or she perversely disregards a known risk that his or her conduct is likely to cause a certain result or is likely to be of a certain nature." Ohio Jury Instructions Section 417.17. The court also gave the OJI instruction of "substantial risk," which defines it as a "strong possibility as contrasted with a remote or even a significant possibility that a certain result may occur or that certain circumstances may exist." Id.
{¶ 135} Upon review, the trial court did not abuse its discretion by denying the Joneses' request for an expanded instruction on recklessness. The expanded instruction that the Joneses sought would have been cumulative to the OJI.[13] Further, the instruction that the court gave mirrored the statutory definition.
{¶ 136} Additionally, the Joneses' contention that the trial court misstated the definition of recklessness by referring to the dictionary is without merit. The statement made by the court was as follows:
Now, I've outlined the essential elements of the offenses charged in this indictment. I could not include all of the law in any single part of these instructions. This is important. You must consider each part in light and in harmony with the entirety of the instruction. It's not to be picked apart word by word, ladies and gentlemen. There's no magic here, okay? Each of the definitions flow, the instructions flow, in light and harmony with each other, all right? And I've said this before to juries. There's no magic to the language. It's common English, Webster's dictionary language here, okay?
{¶ 137} This statement by the court was made after it had instructed the jury on recklessness as set forth in OJI. No other definition of recklessness was provided to the jury. Therefore, viewing the instructions as a whole as we are required to do, we find no abuse of discretion in the court's statement. Thus, the Jones's fourth assignments of error are overruled as it pertains to the "recklessly" instruction given by the court.
Limiting Instruction regarding Carissa's Medical Treatment
{¶ 138} We next consider Carissa's contention that the trial court should have provided the jury with a limiting instruction regarding evidence of the medical treatment she obtained for herself. Carissa contends that the evidence was "other acts" evidence and, therefore, the jury should have received an other acts evidence limiting instruction under Evid.R. 404(B). We disagree.
{¶ 139} Evid.R. 404(B), governing other crimes, wrongs or acts, provides in pertinent that
[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, *735 intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
{¶ 140} Evid.R. 404(B) only applies to limit the admission of so-called "other acts" evidence that is "extrinsic" to the crime charged. State v. Stallworth , 11th Dist. Lake No. 2013-L-122, 2014-Ohio-4297, 2014 WL 4825273, ¶ 37. In other words, " Evid.R. 404(B) does not apply when the acts are intrinsic as opposed to extrinsic, i.e., the acts are part of the events in question or form part of the immediate background of the alleged act which forms the basis for the crime charged." State v. Crew , 2d Dist. Clark No. 2009 CA 45, 2010-Ohio-3110, 2010 WL 2643302, ¶ 99. Thus, "evidence of other crimes or wrongs may be admitted when such acts are so inextricably intertwined with the crime as charged that proof of one involves the other, explains the circumstances thereof, or tends logically to prove any element of the crime charged." State v. Davis , 64 Ohio App.3d 334, 341, 581 N.E.2d 604 (12th Dist.1989), citing State v. Wilkinson , 64 Ohio St.2d 308, 415 N.E.2d 261 (1980) ; State v. Long , 64 Ohio App.3d 615, 582 N.E.2d 626 (9th Dist.1989).
{¶ 141} The endangering children counts alleged that the Joneses "recklessly create[d] a substantial risk to the health or safety of" T.J.; "recklessly abuse[d]" T.J.; and "recklessly torture[d] or cruelly abuse[d]" T.J. The state did not attempt to get Carissa's medical treatment in as an exception to the general ban on other acts under Evid.R. 404(B), that is, to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rather, the state sought to admit the evidence "with regard to the recklessness element and the duty of care * * *."
{¶ 142} In light of the above, the court did not abuse its discretion in not giving an "other acts" limiting instruction as to the evidence of Carissa's medical treatment. The state did not introduce the evidence as a permissible exception to the general ban on other acts evidence under Evid.R. 404(B). Rather, it was introduced as "part and parcel" of the state's theory of recklessness; that is, as the assistant prosecuting attorney contended, for the jury to "[l]ook at [the evidence] in the lens of the duty of care that parents owe to their children," and to consider it in light of the fact that Carissa sought medical treatment for herself days before T.J.'s death, but did not do the same for T.J.
Definition of Homicide: Legal Definition v. Medical Definition
{¶ 143} As mentioned, during his testimony Dr. Gilson stated that the homicide designation as to the manner of T.J.'s death was based on the Jones's "negligence for not seeking medical care." Carissa contends that that testimony confused the jury and the court did not properly instruct the jury on the issue. But, as agreed to by all the parties , the court instructed the jury as follows:
You have heard testimony from experts in the field of forensic pathology. These witnesses have testified as to the meaning of the term homicide within the field of forensic pathology. This testimony is not to be considered for any other purpose than the use of the term homicide within that field and should not be confused with the instructions of law regarding any legal term as used in these instructions.
{¶ 144} "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." State v. Garner , 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). There was no abuse of discretion in the instruction given by the trial court; the instruction cured any potential confusion there may have been.
*736 Lack of Multiple Defendants Instruction
{¶ 145} The last challenge relative to the jury instructions relates to the lack of a "multiple defendants" instruction. The Joneses never requested the instruction and, therefore, have waived all but plain error. State v. Hartman , 93 Ohio St.3d 274, 289, 754 N.E.2d 1150 (2001). Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights. State v. Barnes , 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).
{¶ 146} In a case involving two or more defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as "spill-over" evidence or "guilt transference" that serves as the basis for convicting another defendant not connected to the evidence. United States v. Gallo , 763 F.2d 1504, 1526 (6th Cir.1985). The existence of a "spill-over" or "guilt transference" effect turns in part on whether the numbers of theories and defendants involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him or her to which he or she was entitled. Id. The primary concern is whether the jury will be able to segregate the evidence applicable to each defendant and follow the instructions of the court as they apply to each defendant. Opper v. United States , 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954) ; United States v. Causey , 834 F.2d 1277 (6th Cir.1987).
{¶ 147} The Joneses do not set forth any particulars that would demonstrate that the lack of a "multiple defendants" instruction affected their substantial rights. The evidence against Carissa and Randy was, for all intents and purposes, the same. Their positions were not antagonistic to each other, but, rather, they pursued a joint defense.
{¶ 148} Moreover, at both the start and end of trial, the court informed the jury that Randy and Carissa were separate defendants. At the start, the court told the jury,
[w]hen considering the evidence in this case, at the end of this trial you will deliberate separately for each defendant, all right? So keep that in mind. The evidence that the State has regarding Randy Jones may be different in some sort than the evidence the State has against Carissa Jones, and vice versa, okay?
{¶ 149} At the conclusion of trial, the court told the jury that Randy and Carissa are "separately charged. So this one says State of Ohio v. Carissa Jones . This one says State of Ohio v. Randy Jones . That's what I mean by the defendants are separate and the verdicts are separate for each of them, okay?"
{¶ 150} There was no plain error in the lack of a "multiple defendants" jury instruction, so in light of the above, the Joneses' fourth assignments of error are overruled, and the convictions are affirmed.
Sentences
{¶ 151} In their final assignments of error, Randy and Carissa challenge their ten-year prison sentences. In light of the foregoing decision of the en banc court, we review the ten-year sentences imposed in this case to determine whether, by clear and convincing evidence, the record does not support the sentences.
Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts *737 a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
Cross v. Ledford , 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). Upon review, we find by clear and convincing evidence that the sentences here are not supported by the record.
{¶ 152} A tragedy occurred in this case: T.J. died. On this record, however, we find that imprisoning her parents for ten years does not advance the two primary purposes of felony sentencing, that is, to protect the public from the Joneses and to punish them using minimum sanctions. The record demonstrates that the Joneses exercised poor judgment in the care of T.J. But they cared for her nonetheless and did what they believed was best for her. The public does not need to be protected from them-the likelihood of this happening again is almost nonexistent. And as for punishment-what greater punishment can there be than the death of their child.
{¶ 153} In light of the above and pursuant to the authority afforded us under R.C. 2953.08(G)(2), and as provided in Marcum , we vacate the Joneses' sentences and remand this case to the trial court for resentencing. The fifth assignments of error are sustained; the sentences are vacated and the case is remanded to the trial court for resentencing.
{¶ 154} The decision of the trial court is affirmed in part; reversed in part; remanded for resentencing.
MARY EILEEN KILBANE, J., and MARY J. BOYLE, J., CONCUR

Generally speaking, a sentence is contrary to law if (1) the sentence falls outside the statutory range for the particular degree of offense; (2) the trial court failed to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors in R.C. 2929.12 ; or (3) the trial court fails to adhere to a statutory mandate. State v. Wilson , 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 14, citing Underwood at ¶ 26 ; State v. Price , 2016-Ohio-591, 60 N.E.3d 481, ¶ 12.

In State v. McGowan , 147 Ohio St.3d 166, 2016-Ohio-2971, 62 N.E.3d 178, ¶ 1, the Ohio Supreme Court described the two situations in which an appellate court may act under R.C. 2953.08(G)(2) in terms of an "and/or" proposition instead of the disjunctive used in Brandenburg . That distinction is not a material one in light of the fact that the "and/or" phrase retains the possibility of two positions being in the alternative.

Having said that, there is some historical support for this notion that a sentence unsupported by the record is contrary to law. In the 1997 version of the sentencing review statute, the legislature expressly provided that if an appellate court is statutorily authorized to review the sentence, the court may reverse only "if the court clearly and convincingly finds," among other alternatives, "that the record does not support the sentence." R.C. 2953.08(G)(1)(a), eff. Jan. 1, 1997; State v. Phillips , 8th Dist. Cuyahoga No. 77082, 2000 WL 1513704, 2 (Oct. 12, 2000) ; State v. Howard , 1st Dist. Hamilton No. C-971049, 1998 WL 597651, 3 (Sept. 11, 1998). The legislature, however, removed the language of subdivision (G)(1)(a) starting with the version of R.C. 2953.08 effective October 10, 2000.
In order to harmonize R.C. 2953.08(G) with the limited types of sentences that are reviewable under division (A), the legislature provided statutory guidance as to which sentences were considered to be "contrary to law" under R.C. 2953.08(A)(4) in providing the basis for appellate reversal under division (G) of the statute. State v. Kalish , 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 37, citing State v. Arnett , 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). Under the version of R.C. 2953.08 effective Jan. 1997, the failure to consider the sentencing factors meant the sentence was contrary to law under divisions (A)(4) and (G). Id. ; State v. Catron , 12th Dist. Clermont No. CA2001-03-040, 2001 WL 1567238, 2-3 (Dec. 10, 2001) ; State v. Lesher , 8th Dist. Cuyahoga No. 74469, 1999 WL 561550, 4 (July 29, 1999) ; State v. Fitzmorris , 10th Dist. Franklin No. 98AP-340, 1999 WL 41069, 2 (Dec. 1, 1998). Because the older version of R.C. 2953.08(G) incorporated a basis to reverse an unsupported sentence under division (G), the appellate court's conclusion that the record did not support the sentence meant the imposed sentence was contrary to law for the purposes of division (A).

The state presented Dr. Alarafi as a fact, not expert, witness. He, therefore, had not submitted an expert report, and that was the ground of the defense's objection.

That count alleged that the defendants "recklessly tortured or cruelly abused" T.J.

The expanded definition included language that the "mere failure to perceive or avoid a risk, because of lack of due care, does not constitute reckless conduct" because a defendant "must recognize the risk of the conduct." Peck at ¶ 12.